

# NUMBER 13-18-00187-CV

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI – EDINBURG

FARMERS GROUP, INC., FARMERS
UNDERWRITERS ASSOCIATION, FIRE
UNDERWRITERS ASSOCIATION,
FARMERS INSURANCE EXCHANGE,
FIRE INSURANCE EXCHANGE, GERALD
HOOKS JR., LESLY K. NOLEN, AND
JOSEPH C. BLANKS, P.C.,                                    Appellants,

v.

SANDRA GETER, ON BEHALF
OF HERSELF AND ALL OTHERS
SIMILARLY SITUATED,                                        Appellee.

On appeal from the 172nd District Court
of Jefferson County, Texas.

# MEMORANDUM OPINION

Before Chief Justice Contreras and Justices Benavides and Perkes

## Memorandum Opinion by Chief Justice Contreras

This appeal concerns a class action brought by appellee Sandra Geter, on behalf of herself and all others similarly situated (Geter or the Geter class), against appellants Farmers Group, Inc., Farmers Underwriters Association, Fire Underwriters Association, Farmers Insurance Exchange, and Fire Insurance Exchange (collectively Farmers). The Geter class claimed that Farmers improperly refused to renew their HO-B homeowners insurance policies. The trial court granted partial summary judgment in favor of the class and conducted a trial on attorney's fees. It later rendered judgment requiring Farmers to offer retroactively renewed HO-B policies to all class members, and it awarded the class over $3 million in attorney's fees and court costs.

On appeal, Farmers argues that the trial court: (1) erred by ordering Farmers to offer renewed HO-B policies to all class members; (2) lacked subject matter jurisdiction to order a particular premium rate for those renewed policies; (3) lacked subject matter jurisdiction to compel Farmers to renew the policies; (4) erred in granting specific performance; (5) erred in awarding injunctive relief; (6) erred in granting a motion to show cause filed by the class; and (7) erred in awarding attorney's fees and costs. Appellants Gerald Hooks Jr., Lesly K. Nolen, and Joseph C. Blanks, P.C. (Blanks) argue that the trial court erred by striking their pleas in intervention seeking attorney's fees.

We affirm in part, reverse in part, and remand for further proceedings.[1]

### I. BACKGROUND

In Texas, homeowner's insurance policies must be written on forms approved by

---

[1] This appeal was transferred from the Ninth Court of Appeals in Beaumont pursuant to an order issued by the Texas Supreme Court. *See* TEX. GOV'T CODE ANN. § 73.001. On April 11, 2018, the Texas Supreme Court denied Farmers' motion to re-transfer the case to the Beaumont court.

the Texas Department of Insurance (TDI). TEX. INS. CODE ANN. § 2301.006(a). A policy based on Texas Policy Form HO-B generally provides coverage against all risks to a dwelling, whereas a policy based on Texas Policy Form HO-A typically covers only named perils to a dwelling. TEX. DEP'T OF INS., TEXAS HOMEOWNERS POLICIES 1 (2018), https://www.tdi.texas.gov/reports/documents/texas-homeowners-policies-04122018.pdf. Both HO-A and HO-B policies cover only named perils to dwelling contents. *Id.*

Geter alleged that she attempted to renew her Farmers HO-B policy in 2001. However, on January 4, 2002, Farmers mailed a "Policyholder Notice of Non-Renewal" to Geter stating in part: "Because of substantial losses which we have incurred for the homeowners and dwelling lines of insurance in Texas, we regrettably must inform you that we will no longer offer property insurance coverage in the state of Texas under the policy form you currently have." Farmers instead offered an HO-A policy to Geter.[2]

Geter filed suit later in 2002 alleging that Farmers was required to renew the HO-B policy pursuant to the terms of that policy, which included in relevant part:

6.     Refusal to Renew.

    a.     *We may not refuse to renew this policy because of claims for losses resulting from natural causes.*

    b.     We may not refuse to renew this policy solely because you are an elected official.

    c.     We may refuse to renew this policy if you have filed three or more claims under the policy in any three year period that do not result from natural causes.

        If you have filed two claims in a period of less than three years, we may notify you in writing, that if you file a third claim during the three year period, we may refuse to renew this policy by

---

[2] The HO-A policy offered reduced coverage relative to the HO-B policy because, in addition to covering only named perils to the dwelling, its benefits were based on the actual cash value of the loss, rather than replacement cost as under the HO-B policy.

providing you proper notice of our refusal to renew as provided in d. below. If we do not notify you after the second claim, we may not refuse to renew this policy because of losses.

A claim does not include a claim that is filed but is not paid or payable under the policy.

d.      If we refuse to renew this policy, we must deliver to you, or mail to you at your mailing address shown on the declarations page and any mortgagee named in the declarations page, written notice of our refusal to renew not later than the 30th day before the date in which this policy expires. Proof of mailing will be sufficient proof of notice. If we fail to give you proper notice of our decision not to renew, you may require us to renew the policy.

(Emphasis added.) Geter alleged that there were 433,618 similar Farmers HO-B policies in force in Texas, and she sought class certification for all persons who received notice, as she did, that their policies would not be renewed. Geter sought declaratory relief and an injunction requiring Farmers to renew the HO-B policy. The trial court certified the class under Texas Rule of Civil Procedure 42.[3]

Farmers moved for summary judgment in October 2010, arguing that its non-renewal of the HO-B policies did not violate Texas insurance law or the terms of the

---

[3] The trial court initially certified the class on August 29, 2003, finding in part that appellants "acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole . . . ." *See* TEX. R. CIV. P. 42(b)(2). However, the certification order did not provide for notice to class members, nor did it provide that individuals meeting the class definition may opt out of the class. *See* TEX. R. CIV. P. 42(c)(2)(A) (stating that the court "may direct appropriate notice," including opt-out rights, to a class certified under Rule 42(b)(2)). The Beaumont court of appeals reversed and remanded in light of the Texas Supreme Court's then-recent holding that "a more rigorous definition of class cohesion should apply" in cases where there is no opt-out. *Farmers Group, Inc. v. Geter*, No. 09-03-396-CV, 2004 WL 2365394, at *4 (Tex. App.—Beaumont Oct. 21, 2004, no pet.) (mem. op.) (noting that "the trial court here did not examine the notice and opt-out issues as now required" and "had no opportunity to analyze the cohesiveness that will exist if the court orders notice and opt-out") (citing *Compaq Computer Corp. v. Lapray*, 135 S.W.3d 657, 671 (Tex. 2004)). On remand, the trial court certified the class again—this time requiring notice and providing opt-out rights—and the court of appeals affirmed. *Farmers Group, Inc. v. Geter*, No. 09-05-00386-CV, 2006 WL 4674359, at *5 (Tex. App.—Beaumont July 26, 2007, pet. denied) (mem. op.) ("The trial court, in our view, has meticulously complied with our previous opinion and the requirements of *Lapray*.").

policies (Farmers' first summary judgment motion). The Geter class responded and filed its own motion for partial summary judgment on all issues except attorney's fees (Geter's first summary judgment motion). Geter's motion requested a declaration that: (1) all class members are "entitled to specific performance of their right to renew the HO-B policies"; (2) the term of the renewed policy "shall be one year beginning the date the nonrenewal of their last HO-B policy became effective"; (3) the premium to be charged for the renewed policy "shall be determined by [TDI]"; and (4) Farmers must advise class members on how to accept renewal in a form and manner to be approved by the court.

By order dated November 23, 2010, the trial court denied Farmers' first summary judgment motion and granted Geter's first summary judgment motion. The order stated that each class member is "entitled to renewal" of the HO-B policy and that the term of the renewed policies "shall be one year beginning the date the nonrenewal of their last HO-B policy became effective." The order additionally commanded Farmers to "submit a plan for determining the premium to be charged" for the renewed policies, and it permitted the class to object to Farmers' plan and to offer an alternative plan.

Subsequently, Farmers filed a "Motion for Partial Summary Judgment as to Rating Issues and Remedies" (Farmers' second summary judgment motion) in which it argued in part: (1) the trial court lacks jurisdiction to order a particular premium rate for the renewed HO-B policies; (2) Farmers cannot lawfully issue a policy for a term that has expired; and (3) Geter has not demonstrated the elements required to obtain injunctive relief or specific performance. Geter also filed a second motion for partial summary judgment on the issue of setting the premium for the renewed policies. She argued that the trial court had jurisdiction to set the premium rate as "supplemental relief" under the

5

Uniform Declaratory Judgments Act (UDJA). Geter further noted that, though Farmers charged a premium of $2,181 for the HO-B policy in effect from 2001 to 2002, it demanded a $5,410 premium for the HO-A replacement policy effective the following year, even though the latter policy provided less coverage. She asked the trial court to rule that the premium for the retroactively renewed HO-B policies—which Farmers was required to offer under the November 23, 2010 order—would be the same as the premium Farmers charged for the HO-A replacement policies.[4] The Geter class also filed a "Motion to Show Cause" requesting the same relief.

On June 21, 2011, the trial court signed an order granting Geter's second summary judgment motion, granting Geter's motion to show cause, and denying Farmers' second summary judgment motion. The order set forth the premium rate for the HO-B renewal policies precisely as requested by Geter in her motions.

A trial on attorney's fees only was held over several days in November 2016. The jury found that $812,332.50 was a reasonable fee for necessary services provided by class counsel in the trial court, and it assessed additional conditional amounts for representation on appeal. Pursuant to a motion filed by the class, the trial court stated in findings attached to its final judgment, dated December 14, 2017, that the amounts determined by the jury were a "base lodestar, as that term is used in the Texas Supreme Court," and it found that the class was entitled to a "multiplier [of] 3.75 times the base lodestar . . . especially because of the risk and nature of contingent fee work, the length

---

[4] Specifically, Geter asked the trial court to declare that: (1) members of the class who had already paid the premium for the HO-A replacement policy "will not have to pay any additional premium for their [HO-B] Renewal Policy," and (2) members of the class who had not paid the premium for the HO-A replacement policy "will have to pay the premium charged by Farmers for their HO-A Replacement Policy in order to receive their [HO-B] Renewal Policy."

of time commitment required, the result obtained and the substantial and protracted costs incurred." *See* TEX. R. CIV. P. 42(i)(1) ("In awarding attorney fees [in a class action], the court must first determine a lodestar figure by multiplying the number of hours reasonably worked times a reasonable hourly rate. The attorney fees award must be in the range of 25% to 400% of the lodestar figure."). Accordingly, the trial court awarded the class $3,046,246.88 in trial attorney's fees, along with conditional appellate fees, and $486,789.97 in costs. Farmers then perfected this appeal.

In a separate proceeding initiated in 2002, the State of Texas, TDI, and the Commissioner of Insurance (collectively the State) filed suit in the 261st District Court of Travis County alleging that Farmers violated the Deceptive Trade Practices Act (DTPA). The Travis County suit alleged, among other things, that Farmers charged higher premiums for HO-A policies than it did for HO-B policies; however, the suit did not seek a declaration that the HO-B policies were wrongfully non-renewed. Eventually, Farmers and the State proposed a settlement agreement under which the members of a settlement class, including Hooks and Nolen, would release their claims against Farmers. Hooks and Nolen, represented by Blanks, intervened in the Travis County proceeding in order to prevent the release of any claims for declaratory relief regarding non-renewal of the HO-B policies—i.e., the claims raised in the Geter class action. *See Lubin v. Farmers Gp., Inc.*, No. 03-03-00374-CV, 2009 WL 3682602, at *9 (Tex. App.—Austin Nov. 6, 2009, no pet.) (mem. op. on remand). Farmers eventually entered into a settlement agreement with the State which contained a release that—in accordance with Blanks's demand— "carved out" the declaratory relief requested in the Geter class action.[5] According to

---

[5] Specifically, the definition of "Released Claims" in the Travis County settlement agreement

7

Farmers, the settlement agreement called for it to compensate affected policyholders "in a package valued at over $100 million." The Travis County district court approved the settlement agreement and rendered final judgment in February 2016.

In June 2016, Hooks and Nolen intervened in this class action seeking to recoup their attorney's fees. Their plea in intervention argued that the carve-out they obtained in the Travis County judgment "benefits all Geter class members" because it prevented the release of the declaratory relief sought in the class action. Farmers moved to strike the intervention, and the trial court granted the motion.[6] Blanks then filed its own plea in intervention making the same assertions as Hooks and Nolen; again, the trial court struck the intervention pursuant to Farmers' motion. Hooks, Nolen, and Blanks appealed the rulings.

## II. DISCUSSION

### A. Standard of Review

We review summary judgments de novo. *Neely v. Wilson*, 418 S.W.3d 52, 59 (Tex. 2013). A movant for traditional summary judgment has the burden to establish that no genuine issue of a material fact exists and that it is entitled to judgment as a matter of law. TEX. R. CIV. P. 166a(c); *Amedisys, Inc. v. Kingwood Home Health Care, LLC*, 437

---

included the following paragraph:

> Notwithstanding the foregoing, the claim for declaratory relief only without any claim for damages, which has been certified as a class action, and as set forth in the Order of November 23, 2010, in the pending *Geter v. Farmers Group, Inc., et al.*, No. E-0167872 in the 172nd District Court of Jefferson County, Texas, is not released by this definition. All other class claims are released.

[6] Hooks and Nolen filed a petition for writ of mandamus seeking to vacate the order striking their intervention in the class action, which the Beaumont court of appeals denied. *In re Hooks*, No. 09-16-00402-CV, 2016 WL 6809254, at *1 (Tex. App.—Beaumont Nov. 15, 2016, orig. proceeding) (mem. op.) (concluding that Hooks and Nolen "have not demonstrated an abuse of discretion by the trial court for which no adequate remedy by appeal exists").

8

S.W.3d 507, 511 (Tex. 2014). A fact issue exists if there is more than a scintilla of probative evidence to support each element of the plaintiff's claim. *Neely*, 418 S.W.3d at 59. We review the summary judgment evidence in the light most favorable to the non-movant, indulging every reasonable inference and resolving any doubts against the motion. *Buck v. Palmer*, 381 S.W.3d 525, 527 (Tex. 2012) (per curiam); *City of Keller v. Wilson*, 168 S.W.3d 802, 824 (Tex. 2005).

When both parties move for summary judgment and the trial court grants one motion and denies the other, we review all the summary judgment evidence, determine all issues presented, and render the judgment the trial court should have rendered. *Merriman v. XTO Energy, Inc.*, 407 S.W.3d 244, 248 (Tex. 2013).

## B. Declaratory Relief

By its first issue[7] on appeal, Farmers contends that the trial court erred by rendering summary judgment declaring that it was required to offer retroactive renewed HO-B policies to all class members. In particular, Farmers argues that it was not required to renew under the plain language of the policy or under the insurance code. By its third issue, Farmers argues that the trial court lacked subject matter jurisdiction to compel renewal of the HO-B policies.

### 1. Applicable Law

In general, the goal of contract interpretation is to ascertain the parties' true intent as expressed by the plain language they used. *Great Am. Ins. Co. v. Primo*, 512 S.W.3d 890, 892–93 (Tex. 2017); *see Gilbert Tex. Const., L.P. v. Underwriters at Lloyd's London*,

---

[7] In its appellate brief, Farmers presents one "primary issue" with seven "sub-issues." The "primary issue" argues generally that the trial court erred by entering the November 23, 2010 and June 21, 2011 summary judgment orders. We consider Farmers' "sub-issues" to be the issues presented for review in this case. *See* TEX. R. APP. P. 38.1(f).

9

327 S.W.3d 118, 126 (Tex. 2010) (explaining that "we look at the language of the policy because we presume parties intend what the words of their contract say"). But the contract at issue here is a standard policy form prescribed by TDI, and so "the intent of the parties is not what counts because they did not write the contract." *Greene v. Farmers Ins. Exch.*, 446 S.W.3d 761, 766 (Tex. 2014) (citing *Fiess v. State Farm Lloyds*, 202 S.W.3d 744, 746 (Tex. 2006)). "Rather, the policy language is interpreted according to the ordinary, everyday meaning of its words to the general public." *Id.* (citing *Fiess*, 202 S.W.3d at 746). We construe policy language so that no provision is rendered meaningless, and we may not insert language or provisions the parties did not use. *Primo*, 512 S.W.3d at 892–93 (citing *Nat'l Union Fire Ins. Co. v. Crocker*, 246 S.W.3d 603, 606 (Tex. 2008)). We assign terms their ordinary and generally accepted meaning unless the contract directs otherwise. *Id.* at 893. If the language lends itself to a clear and definite legal meaning, the contract is not ambiguous and it will be construed as a matter of law. *Id.* (citing *Am. Mfrs. Mut. Ins. Co. v. Schaefer*, 124 S.W.3d 154, 157 (Tex. 2003)).

## 2. Summary Judgment Motions and Evidence

Geter's first summary judgment motion argued that, under the unambiguous terms of the policy, Farmers' non-renewal of the HO-B policy was improper. She attached the following documents to her motion: (1) her original petition; (2) her non-renewed HO-B policy; (3) the non-renewal notice sent by Farmers; (4) the substitute HO-A policy Farmers offered to her; (5) a State Board of Insurance order dated November 23, 1993, requiring the inclusion of an endorsement in all homeowners insurance policies regarding the

10

insurer's refusal to renew[8]; (6) the trial court's order certifying the class; (7) a November 14, 2001 letter from a Farmers executive to the Commissioner of Insurance; (8) an excerpt from a transcript of a trial court hearing on class certification; (9) a 2002 "Application for Emergency Cease and Desist Order" filed by TDI, alleging that Farmers "unfairly overcharg[ed] policyholders for HO-A coverage"; (10) an "Emergency Cease and Desist Order" issued in 2002 by Commissioner of Insurance pursuant to TDI's application; and (11) an affidavit by Geter's counsel attesting to the authenticity of the exhibits.

As noted above, the HO-B policy at issue here contained a section entitled "Refusal to Renew" which was comprised of four paragraphs. Paragraph (a) explained that Farmers "may not refuse to renew this policy because of claims for losses resulting from natural causes." Paragraph (b) stated that Farmers "may not refuse to renew this policy solely because [the insured is] an elected official." Paragraph (c) set forth that Farmers "may refuse to renew" the policy if the insured filed "three or more claims under the policy in any three year period that do not result from natural causes." Paragraph (d) provided notice requirements in the event that Farmers decided not to renew the policy, and stated: "If we fail to give [the insured] proper notice of our decision not to renew, [the insured] may require us to renew the policy."[9]

---

[8] The endorsement (designated "HO-350") required by the 1993 order was identical to paragraph (c) of the "Refusal to Renew" section in Geter's HO-B policy. The 1993 order stated that insurers may discontinue the use of the endorsement when the amended language has been incorporated into the homeowners coverage forms promulgated by TDI.

[9] In her motion, Geter pointed out that a "Consumer Bill of Rights for Homeowners and Renters Insurance," promulgated by TDI, was attached to the non-renewed HO-B policy. Regarding the refusal to renew, the "Consumer Bill of Rights" largely mirrored the terms of the policy, stating in part as follows:

8.      If the insurance company does not mail you notice of non-renewal at least 30 days before the policy expires, you have the right to require that your policy be renewed.

9.      You have the right to a written explanation of an insurance company's decision to cancel or not to renew your policy. You must request the explanation.

In her summary judgment motion, Geter asserted:

> [A] consumer reading the non[-]renewal provisions would understand that her policy couldn't be non[-]renewed just because she was paid for a hurricane claim; that she was protected up to a set threshold for non-weather claims (and entitled to notice if Farmers intended to non[-]renew); and, that only filed and paid non-weather claims could be considered to justify non[-]renewal based on paid claims.

She further argued that it is undisputed that "Farmers chose to rely on paid claims to justify its blanket non[-]renewal of the HO-B policies owned by the class." In support of that position, she cited the January 4, 2002 notice of non-renewal, which stated: "Because of substantial losses which we have incurred for the homeowners and dwelling lines of insurance in Texas, we regrettably must inform you that we will no longer offer property insurance coverage in the state of Texas under the policy form you currently have." Geter also pointed to a 2001 letter from John P. Hageman, Farmers' "Texas Executive Officer," to then-Commissioner of Insurance Jose Montemayor. In the letter, Hageman stated:

> We are not withdrawing from the homeowners insurance market in the State of Texas. On the contrary, we have been in the homeowners insurance business in Texas for over 50 years, and we remain committed to this business. *Our decision to offer our insured the HO[-]A policy upon renewal, and not the HO[-]B, is motivated primarily by the dramatic increases that we have experienced for water, mold and foundation claims, and the resultant underwriting losses.*

---

. . . .

12    Your insurance company cannot cancel or refuse to renew your policy because you have filed claims for damage from natural causes, including weather-related damage. However, your insurance company can cancel your policy for weather-related claims during the first 90 days of the initial policy period.

13.    Your insurance company cannot refuse to renew your policy because you have filed claims for damage that is not from natural causes unless:

- you have filed two or more of these claims in less than three years; and

- the insurance company has notified you that they may refuse to renew your policy if you file a third claim within the three-year period.

As you are aware from the information we have provided to you, we have lost about $600 million in this line of business in just the last two years. We strongly believe that it is a demonstration of our commitment to our policyholders that we are attempting to resolve this problem by offering the HO[-]A policy, combined with an offer of replacement cost coverage for dwelling/or contents [sic]. It is our expectation that the vast majority of HO[-]B customers will accept our offer of the HO[-]A policy.

(Emphasis added.)

### 3. Analysis

Generally, when there is no clause in a policy expressly granting a privilege or imposing a duty of renewal, neither the insurer nor the insured have any right to compel renewal. STEVEN PLITT, ET AL., COUCH ON INS. § 29:5 (3d ed. 2019). "Under such a policy, the insurer may decline to renew the policy at the end of any premium payment period for any reason whatever or for no reason at all." *Id.*; *see Madden v. Ind. Lumbermens Mut. Ins. Co.*, 451 S.W.2d 764, 765 (Tex. App.—Dallas 1970, writ ref'd n.r.e.) (holding, where policy did not set forth a duty or right of renewal, that "appellee had the right to decline to renew appellant's automobile insurance for any reason whatever, or for no reason at all"); *see also Am. Nat'l Ins. Co. v. Ball*, 218 S.W. 71, 71–73 (Tex. App.—San Antonio 1920, no writ) (holding, where "typical accident and health policy" was "for a definite term," that the "insurer reserved the right to decline to renew"); *cf. Am. Nat'l Ins. Co. v. Wilson State Bank*, 480 S.W.2d 296, 298 (Tex. App.—Amarillo 1972, no writ) (considering policy explicitly providing, unlike here, that "[insurer] shall not have the right to refuse to renew any Benefit of this policy during the Renewal Period of such Benefit unless, at the same time, it declares its intention to non-renew all policies of the same class which were issued on this form in the same state and county").

Here, however, the "Refusal to Renew" section purports to restrict Farmers' general right to decline to renew the policy. Paragraph 6(d) states that the insured "may

13

require" Farmers to renew if Farmers does not give "proper notice" of non-renewal. Though Farmers timely notified Geter of its intent to non-renew the HO-B policy, Geter argues that the notice was "[im]proper" because the non-renewal was "because of claims for losses resulting from natural causes," which is prohibited by paragraph 6(a). Thus, to be entitled to summary judgment on whether she was entitled to renewal, Geter had to establish as a matter of law that Farmers' decision to non-renew was made "because of claims for losses resulting from natural causes." *See* TEX. R. CIV. P. 166a(c).

We conclude that Geter met her burden. According to the notice of non-renewal, Farmers made the decision not to renew "[b]ecause of substantial losses which we have incurred for the homeowners and dwelling lines of insurance in Texas . . . ." Hageman's letter further explains that the "substantial losses" which Farmers suffered were "underwriting losses" that resulted from the "dramatic increases that we have experienced for water, mold and foundation claims . . . ." The notice and the letter, taken together, establish that (1) the decision to non-renew was made "because of claims," and (2) those claims were "for losses resulting from natural causes"—i.e., "water, mold and foundation claims." Farmers did not produce any evidence controverting the notice or the letter or otherwise generating a fact issue with regard to its reasons for non-renewal. *See id.*

As in its first summary judgment motion, Farmers argues on appeal that there was nothing in the policy that prohibited it from "non-renewing all HO-B policies on a statewide basis." Farmers contends that the trial court's judgment "effectively inserted the following language" in the "Refusal to Renew" section: "Absent the circumstances set forth in Sections a., b., or c., this policy will be renewed at the conclusion of its term." We disagree that the trial court added language to the policy that was not already implicit in its terms.

14

As noted, an insurer generally has the right to refuse to renew for any reason or for no reason at all. *See Madden*, 451 S.W.2d at 765. But parties may contract otherwise. And by providing that Farmers "may not refuse to renew" under certain circumstances, the policy clearly restricts the types of situations under which Farmers could choose to non-renew. In those circumstances, regardless of whether the non-renewal is on an individual or statewide basis, the policy necessarily implies that Farmers *must* renew.

Farmers additionally appears to suggest that the "claims for losses resulting from natural causes" in paragraph 6(a) refers only to claims made *by the insured whose policy was non-renewed*. Under this interpretation, Farmers would be free to non-renew as long as the "claims for losses" giving rise to the non-renewal were filed by policyholders other than the insured seeking renewal. But the plain language of the policy does not support this interpretation. Paragraph 6(a) refers broadly to "claims" and it does not state, explicitly or implicitly, that the "claims" must be made by the insured in order for the paragraph to be invoked. We observe that the drafters of Form HO-B could have easily achieved Farmers' proposed outcome by adding the words "you filed" after "claims" in paragraph 6(a). The drafters used similar limiting language in paragraph 6(c). The fact that they did not do so in paragraph 6(a) strongly indicates an intent to prohibit non-renewal on the basis of "claims for losses resulting from natural causes" filed by *any* policyholder, not just the insured whose policy is at issue.

Farmers contends that the trial court's construction of the policy generates an absurd and illogical result. *See Lane v. Travelers Indem. Co.*, 391 S.W.2d 399, 402 (Tex. 1965) (refusing to construe insurance policy in manner which would lead to absurd results). It argues that "it is undisputed that an insurer may refuse to renew a policy on

15

underwriting grounds; that is, if the structure does not meet the insurer's underwriting guidelines, i.e., the home is in significant disrepair, has a leaky roof, or problems with plumbing, heating or cooling systems." Farmers asserts that, under the trial court's ruling, it would be "required to issue policies to homeowners even if their property is in disrepair because disrepair is not listed in Section 6." Again, we disagree. Farmers retains its right to refuse to renew for any reason, or for no reason at all, as long as it provides "proper notice," and as long as the reason is not one of the ones prohibited under the policy. Unfortunately for Farmers, the evidence establishes that the reason for its non-renewal in this case was one of the reasons specifically prohibited under the policy. Accordingly, the trial court did not err in ruling that Geter was entitled to renewal under the terms of the policy. We overrule Farmers' first issue.

## C. Subject Matter Jurisdiction

### 1. Rate-Setting

By part of its second issue, Farmers argues that the trial court lacked subject matter jurisdiction to order a particular premium rate for the renewed HO-B policies. Specifically, Farmers contends that the trial court's order violates constitutional separation of powers because exclusive jurisdiction to set rates lies with TDI.[10] Subject matter jurisdiction presents a question of law which we review de novo. *City of Houston v. Rhule*, 417 S.W.3d 440, 442 (Tex. 2013).

Under the separation of powers doctrine, governmental authority vested in one department of government cannot be exercised by another department unless expressly

---

[10] Similarly, Farmers contends by its third issue that the court lacked subject matter jurisdiction to compel renewal of the HO-B policies because TDI has exclusive jurisdiction to regulate policy forms.

16

permitted by the constitution. *Tex. Ass'n of Bus. v. Tex. Air Control Bd.*, 852 S.W.2d 440, 444 (Tex. 1993); *see* TEX. CONST. art. II, § 1. The subject matter jurisdiction of a district court is limited by this doctrine. *Tex. Ass'n of Bus.*, 852 S.W.2d at 444; *see* TEX. CONST. art. V, § 8 ("District Court jurisdiction consists of exclusive, appellate, and original jurisdiction of all actions, proceedings, and remedies, except in cases where exclusive, appellate, or original jurisdiction may be conferred by this Constitution or other law on some other court, tribunal, or administrative body.").

Farmers argues that "rate-making" is an authority exclusively vested in the legislature, and that while the legislature may delegate that authority to administrative agencies, it may not delegate that authority to the judiciary. *See Daniel v. Tyrrell & Garth Inv. Co.*, 93 S.W.2d 372, 375 (Tex. 1936) (noting that, because insurance is "a business affected by a public interest," "the Legislature has the power to provide reasonable rules and regulations governing its policy forms and rates," and this power "does not appertain to the judicial department of our government"). It notes that, since 2003, insurers have been prohibited from offering homeowners insurance policies without obtaining rate approval from TDI.[11] Farmers posits that the trial court's judgment setting a premium rate

---

[11] The Austin court of appeals has explained:

From 1991 through 2003, Texas insurance companies operated under a system of flexible rate setting, which allowed insurers to charge up to 30 percent more or less than a state-promulgated benchmark rate. During that time period, in an effort to avoid regulation, insurance companies began shifting more and more of their business toward unregulated branches called Lloyd's companies. Originally unregulated because they generally covered specialty risks at lower-than-standard rates, Lloyd's companies grew from about 20 percent of the market in 1991 to about 95 percent of the market in 2003. Thus, by 2003, only five percent of the Texas homeowners insurance market was regulated. In this mostly unregulated market, Texas consumers were paying the highest premiums in the country, often for policies providing reduced coverage.

To address these issues, the Texas Legislature passed Senate Bill 14, which amended the insurance code to establish a new system for regulating residential property insurance rates. Under the new system, insurers were required to file their rates with TDI, and TDI would then review and either approve or disapprove those rates.

for the renewed HO-B policies "usurp[s] the jurisdiction of the TDI, which had no opportunity to review and approve the rate determined by the trial court as required by present law."

Farmers additionally observes that, in her first motion for summary judgment, Geter did not ask the trial court to set the premium rate; rather, she requested a declaration that "[t]he premium to be charged for the Renewal Policy shall be determined by [TDI]." And Farmers points to the Beaumont court of appeals' 2007 opinion affirming class certification in this case, which in part rejected Farmers' assertion that certification was improper because "it usurps the role of the TDI." *Farmers Group, Inc. v. Geter*, No. 09-05-00386-CV, 2006 WL 4674359, at *3 (Tex. App.—Beaumont July 26, 2007, pet. denied) (mem. op.). There, the court stated: "Even if the TDI may be involved in setting the rate for the HO-B policy if the class is successful in requiring Farmers to renew the policy, this is a post-litigation administrative matter not affecting the initial class certification." *Id.*

We agree with Farmers that the trial court lacked subject matter jurisdiction to set premium rates for retroactive renewed policies. The purpose of the statute authorizing TDI to set rates is in part to "promote the public welfare by regulating insurance rates to prohibit excessive, inadequate, or unfairly discriminatory rates." TEX. INS. CODE ANN. § 2251.001. Under current law, insurers are required to file proposed rates, along with supporting information, to TDI, and the Commissioner of Insurance may disapprove of the rate and prohibit its use if it is deemed excessive or otherwise improper. *See id.* §§ 2251.101, .104(b)(2). On the other hand, as of the beginning date of the renewed HO-

---

*Geeslin v. State Farm Lloyds*, 255 S.W.3d 786, 792 (Tex. App.—Austin 2008, no pet.) (citations omitted).

B policies as ordered by the trial court,[12] there was no statute or rule in effect requiring insurers to submit proposed rates to TDI for approval. Instead, prior to 2003, insurers were permitted to charge up to thirty percent more or less than a benchmark rate promulgated by TDI. *Geeslin v. State Farm Lloyds*, 255 S.W.3d 786, 792 (Tex. App.—Austin 2008, no pet.).[13] The parties dispute which version of the law should apply in this unique situation, where the trial court has issued an order in 2018 compelling Farmers to offer policies effective for a time period that ended more than fifteen years prior. But under either version of the law, the TDI is the only entity authorized by law to determine what premium an insurer may permissibly charge.[14] The trial court therefore infringed on TDI's exclusive jurisdiction by setting premium rates for the retrospective HO-B policies. *See* TEX. CONST. art. V, § 8; *Daniel*, 93 S.W.2d at 375; *see also Geter*, 2006 WL 4674359, at *3.

## 2. Renewal

We have already held that the trial court did not err in determining that Geter was entitled to renewal of the HO-B policies, given the terms of those policies and Farmers' stated reason for the non-renewal. Farmers further argues by its second issue that, under

---

[12] As noted, the trial court ordered that the term of the renewed HO-B policies "shall be one year beginning [on] the date the nonrenewal of [each class member's] last HO-B policy became effective." The notice of non-renewal sent to Geter in 2002 stated that the expiration date of her policy was February 25, 2002. Therefore, at least as to Geter, the renewed policy ordered by the trial court would be effective from February 25, 2002, to February 25, 2003.

[13] The parties do not direct us to any evidence in the record showing what the applicable benchmark rate was as of 2002, nor do they explain whether the rate set by the trial court in this case was within the permissible range.

[14] Farmers notes that two of the appellants, Farmers Insurance Exchange and Fire Insurance Exchange, are "inter-insurance exchanges" and would therefore have been exempt from rate regulation entirely in 2002. *See* TEX. INS. CODE ANN. § 942.003(a) (current version of statute). But the Geter class includes all HO-B policyholders who received a notice of non-renewal "from one or more Defendants." Thus, the fact that two of the appellants would not have been subject to rate regulation in 2002 does not affect our analysis.

19

the separation of powers doctrine, the trial court nevertheless lacked subject matter jurisdiction to "order a particular policy form" for the retroactively-renewed policies. It contends that TDI has the exclusive jurisdiction to authorize the use of policy forms, and it argues that TDI prohibited the use of the particular form at issue here—the 2001 version of the HO-B Policy Form—after December 31, 2002.

In response, Geter contends that the class merely sought to enforce the terms of Farmers' own policy, and to the extent those terms required renewal, they required renewal of the same policy which had been in effect prior to the renewal. Geter further notes that there was no prohibition against using the 2001 version of the HO-B Policy Form as of 2002, which is when the policy period for the renewal policies was ordered to begin. We agree on the latter point. The trial court did not infringe upon TDI's exclusive jurisdiction to approve policy forms because it ordered renewal of a form which, undisputedly, was approved for use by the TDI as of the time it was ordered to be effective.

Farmers' second issue is sustained in part and overruled in part.

## D.    Specific Performance

By its fourth issue, Farmers contends that the award of specific performance was improper for several reasons, including: (1) a policy cannot be issued or a premium fixed for a term that has already expired; (2) the essential terms of the renewed policies were uncertain; (3) the class members did not plead or prove that they were ready, willing, and able to perform; and (4) there was no mutuality of obligation.

Specific performance is an equitable remedy that may be awarded upon a showing of breach of contract. *Yazdani-Beioky v. Sharifan*, 550 S.W.3d 808, 829 (Tex. App.—

20

Houston [14th Dist.] 2018, pet. denied); *Stafford v. S. Vanity Magazine, Inc.*, 231 S.W.3d 530, 535 (Tex. App.—Dallas 2007, pet. denied). A party seeking specific performance must plead and prove: (1) compliance with the contract including tender of performance unless excused by the defendant's breach or repudiation; and (2) the readiness, willingness, and ability to perform at relevant times. *DiGiuseppe v. Lawler*, 269 S.W.3d 588, 593–94, 601 (Tex. 2008); *Yazdani-Beioky*, 550 S.W.3d at 829. Specific performance is not a separate cause of action; rather, it is an equitable remedy that is used as a substitute for monetary damages when such damages would not be adequate. *Ifiesimama v. Haile*, 522 S.W.3d 675, 685 (Tex. App.—Houston [1st Dist.] 2017, pet. denied); *Stafford*, 231 S.W.3d at 535. The existence of an adequate remedy at law forecloses the availability of equitable relief in the form of specific performance. *Sharyland Water Supply Corp. v. City of Alton*, 354 S.W.3d 407, 423 (Tex. 2011).

Specific performance may be ordered "only if the essential terms of the contract are expressed with reasonable certainty." *Johnson v. Snell*, 504 S.W.2d 397, 398 (Tex. 1973); *TLC Hosp., LLC v. Pillar Income Asset Mgmt., Inc.*, 570 S.W.3d 749, 768 (Tex. App.—Tyler 2018, pet. denied); *Paciwest, Inc. v. Warner Alan Props., LLC*, 266 S.W.3d 559, 571 (Tex. App.—Fort Worth 2008, pet. denied). Farmers contends that specific performance of the non-renewal provisions in the HO-B policy was improper because those provisions did not specify the premium to be paid for any contemplated renewal policy. We agree. The price of the premium to be paid is an "essential term" of an insurance contract. *See In re Tex. Ass'n of Sch. Bds., Inc.*, 169 S.W.3d 653, 658 (Tex. 2005) (orig. proceeding) ("The payment of the premium by the insured and the assumption of a specified risk by the insurer are the essential elements of the contract of

insurance."); *Republic Nat'l Life Ins. Co. v. Hall*, 232 S.W.2d 697, 699 (Tex. 1950) ("An essential element to be agreed upon in a life insurance contract is the amount of the premium."). Here, the parties never agreed on a premium rate for a renewed HO-B policy effective in 2002 and 2003, for the simple reason that Farmers never intended to offer such a policy. The 2001 HO-B Policy Form did not specify that any particular rate would apply in the event of renewal, and Geter has never argued that her entitlement to renewal of the HO-B policy meant that she was also entitled to pay the same premium for the renewed policy as she paid in 2001. Instead, Geter proposed that the premium rate applicable to the renewed HO-B policy effective in 2002 and 2003 would be the same rate actually charged by Farmers for the HO-A policy effective for those same years. The trial court adopted that proposal, but it was improper to order specific performance of a contract whose price terms were not set forth with reasonable certainty therein. *See Johnson*, 504 S.W.2d at 398; *TLC Hosp., LLC*, 570 S.W.3d at 768; *Paciwest, Inc.*, 266 S.W.3d at 571.

Moreover, as Farmers notes, courts have held that "a policy issued after the loss is sustained is invalid." *Trinity Universal Ins. Co. v. Rogers*, 215 S.W.2d 349, 353 (Tex. App.—Dallas 1948, no writ); *see U.S. Cas. Co. v. Rodriguez*, 288 S.W. 487, 488 (Tex. App.—San Antonio 1926, writ ref'd) ("[A] life policy, issued after the death of a party, or a fire insurance policy issued after the loss, is invalid. An agent has no authority to issue a policy to cover a known loss."); *see also Breslin v. Tex. Farmers Ins. Co.*, No. 05-99-00036-CV, 2000 WL 960120, at *3 (Tex. App.—Dallas July 12, 2000, no pet.) ("[I]t is contrary to public policy for an insurance company to knowingly assume a loss occurring prior to insuring that loss."). That is especially true in this case, where Farmers has been

22

ordered to offer a renewal HO-B policy for 2002 and 2003, but the class members are under no mutual obligation to accept the offer. *See Tex. Specialty Underwriters, Inc. v. Tanner*, 997 S.W.2d 645, 648 (Tex. App.—Dallas 1999, pet. denied) (observing that "an insured cannot be forced to renew a policy that he does not want"); *see also TLC Hosp., LLC*, 570 S.W.3d at 771 ("[I]f the option is properly accepted the optionor is bound thereby and the optionee may obtain specific performance."); *Smith v. Hues*, 540 S.W.2d 485, 490 (Tex. App.—Houston [14th Dist.] 1976, writ ref'd n.r.e.) (noting that "mutuality of remedy at the inception of the contract is not an essential element in a suit for specific performance" where the party seeking specific performance has itself already performed). Under the trial court's order in this case, the Geter class members would be able to decide whether or not to pay for the retroactive renewal HO-B policy with full knowledge of whether or not they had sustained covered losses during the renewal policy period. We agree with Farmers' argument that

> [f]orcing Farmers to retroactively pay out claims for potentially thousands of insureds who already know that they have suffered a covered loss without counterbalancing those payments with premiums from insureds who did not suffer a covered loss would be financially catastrophic to Farmers or any insurer. It also provides an unjust windfall to the class members by allowing them to choose to buy an HO-B policy only if the damages they could recover exceed the cost of the policy.

For the foregoing reasons, we conclude that the trial court erred by awarding specific performance of the HO-B policy's non-renewal provisions as a remedy for Farmers' breach of contract. Instead, the trial court should have granted Farmers' second summary judgment motion to the extent it argued that specific performance is unavailable as a remedy in this case. We sustain Farmers' fourth issue.

## E.    Attorney's Fees and Costs

By its seventh issue, Farmers contends that the trial court erred in granting

23

attorney's fees and costs to the Geter class. It contends that the award of fees should be reversed because the Geter class is not entitled to declaratory judgment for the reasons set forth in its other issues.

In a suit seeking declaratory relief under the UDJA, the trial court "may award costs and reasonable and necessary attorney's fees as are equitable and just." TEX. CIV. PRAC. & REM. CODE ANN. § 37.009. The statute does not require that a party prevail on the merits in order to be awarded fees. *See id.*; *Barshop v. Medina Cty. Underground Water Conservation Dist.*, 925 S.W.2d 618, 637 (Tex. 1996) (rejecting argument that party had to "substantially prevail" in order to recover attorney's fees under UDJA). Though we have found that specific performance was not an appropriate remedy under the particular facts of this case, we have also concluded that the trial court did not err in determining that Geter was entitled to renewal of the HO-B policy under the policy's terms. Therefore, the class was entitled to declaratory relief in that regard. Farmers does not raise any other argument challenging the fee award. Accordingly, its seventh issue is overruled.

## F. Pleas In Intervention

In their appeal, Hooks, Nolen, and Blanks (the intervenors) argue that the trial court erred in striking their pleas in intervention seeking attorney's fees.

### 1. Standard of Review and Applicable Law

We review a ruling on a motion to strike an intervention for abuse of discretion. *Mendez v. Brewer*, 626 S.W.2d 498, 499 (Tex. 1982); *Jenkins v. Entergy Corp.*, 187 S.W.3d 785, 795 (Tex. App.—Corpus Christi–Edinburg 2006, pet. denied). A trial court abuses its discretion if it acts without reference to guiding rules and principles. *Downer v. Aquamarine Operators, Inc.*, 701 S.W.2d 238, 241 (Tex. 1985).

24

Texas Rule of Civil Procedure 60 provides that "[a]ny party may intervene by filing a pleading, subject to being stricken out by the court for sufficient cause on the motion of any party." TEX. R. CIV. P. 60. Although the trial court has broad discretion in determining whether an intervention should be struck, it is an abuse of discretion to strike a plea in intervention if: (1) the intervenor could have brought the same action, or any part thereof, in his own name, or if the action had been brought against him, he would be able to defeat recovery, or some part thereof; (2) the intervention will not complicate the case by an excessive multiplication of the issues; and (3) the intervention is "almost essential to effectively protect the intervenor's interest." *Guar. Fed. Sav. Bank v. Horseshoe Operating Co.*, 793 S.W.2d 652, 657 (Tex. 1990).

### 2. Analysis

Hooks and Nolen were Farmers HO-B policyholders and members of the Geter class; Blanks is a law firm that represented Hooks and Nolen in their efforts to intervene both in the Travis County litigation and the instant class action. In its motion to strike the class action interventions, Farmers argued: (1) the intervenors did not have a present justiciable interest in the case; (2) the interventions were untimely because the merits of the case had already been decided by the trial court's partial summary judgment orders; (3) the award of fees is barred by res judicata because the Travis County court already declined their request for fees; and (4) there is no legal basis to award fees because Blanks was not designated as class counsel under Rule 42. The trial court did not specify which grounds it relied upon to strike the intervention.

In response, Hooks and Nolen observe that, had they not intervened in the Travis County suit and obtained the carve-out in the settlement agreement's release provision,

25

"there would be no Geter Class Action to intervene in" because the claims made in the class action would have otherwise been released. They contend that they necessarily had a justiciable interest in the Geter class action because they were members of the class designated in that case, and that res judicata cannot apply because the fees they are seeking pertain only to the causes of action raised in the class action—i.e., the ones carved out of the release. Finally, the intervenors note that the notice provided to the Geter class members stated that any class member "may enter an appearance through counsel if the member so desires," and they argue that, although the trial court had already rendered partial summary judgment in favor of the class by the time they intervened in the suit, intervention is generally permissible at any time until a final judgment is rendered. *See First Alief Bank v. White*, 682 S.W.2d 251, 252 (Tex. 1984) ("[A] plea in intervention comes too late if filed after judgment and may not be considered unless and until the judgment has been set aside."); *Malone v. Hampton*, 182 S.W.3d 465, 468 (Tex. App.—Dallas 2006, no pet.) ("A non-party successfully intervenes if he files a plea in intervention prior to entry of judgment and the court does not strike the plea on motion of a party.").

On appeal, Farmers contends that the untimeliness of the interventions provided "sufficient cause" for the trial court to grant the motion to strike. *See* TEX. R. CIV. P. 60. In determining whether untimeliness constitutes sufficient cause to strike an intervention, courts consider: (1) the length of time during which the would-be intervenor should have known of its interest in the case before attempting to intervene; (2) the extent of prejudice that the existing parties may suffer as a result of the would-be intervenor's failure to apply for intervention as soon as it actually knew or should have known of its interest in the

26

case; (3) the extent of prejudice the would-be intervenor would suffer if intervention is denied; and (4) the existence of unusual circumstances militating either for or against a determination that the application is timely. *Ross v. Marshall*, 426 F.3d 745, 754 (5th Cir. 2005); *see In re Lumbermens Mut. Cas. Co.*, 184 S.W.3d 718, 726 (Tex. 2006) (orig. proceeding) (stating that the factors articulated in *Ross* are also useful in determining the "timeliness of a virtually-represented party's effort to invoke appellate rights"). These factors "give structure" to the timeliness analysis, but the "analysis remains contextual" and "should not be used as a tool of retribution to punish the tardy would-be intervenor, but rather should serve as a guard against prejudicing the original parties." *Ross*, 426 F.3d at 754 (internal quotations omitted).

Here, the intervenors were aware of their interest in the Geter class action since at least 2003, when they filed their Travis County plea in intervention which specifically mentioned the Geter litigation. Farmers argues that the thirteen-year gap between that time and June of 2016—when Hooks and Nolen first sought to intervene in the underlying case—supports the trial court's ruling. It notes that Hooks and Nolen's plea sought, in addition to attorney's fees, a "modif[ication]" of the previously-granted declaratory relief,[15] and it suggests that allowing the intervention therefore may have delayed the final disposition of the case. However, beyond the theoretical possibility of delay in obtaining a final judgment—in a case that had already been pending for fourteen years as of the

---

[15] Specifically, even though the trial court had already granted summary judgment on the premium issue in 2011, the 2016 plea in intervention filed by Hooks and Nolen stated:

> Intervenors further petition the Court to modify the scope of declaratory relief granted in its Partial Summary Judgment by declaring that the class members had and have an absolute right to renew their HO-B policies that Farmers refused to renew, leaving for later supplemental relief, if an actual dispute arises, the issue of premiums fairly to have been charged or still owing for such renewals or successive renewals.

time of the intervention—Farmers does not articulate how or to what extent it would have been substantively prejudiced had Hooks and Nolen been permitted to intervene in 2016. *See id.*

The final judgment in the Travis County case—which incorporated the settlement agreement, which in turn contained the release with the carve-out provision allowing the Geter class action to proceed—was not rendered until February 2016. Hooks and Nolen filed their intervention in the class action about four months later. We conclude that, under the "unusual circumstances" presented in this case, the intervention filed by Hooks and Nolen was timely. *See id.* The trial court abused its discretion if it granted the motion to strike on the basis of untimeliness.

Farmers' other arguments in favor of striking the intervention also lack merit. It is undisputed that Hooks and Nolen are properly considered members of the Geter class under the class definition provided in the certification order; therefore, Hooks and Nolen had a justiciable interest in the litigation. *See In re Union Carbide Corp.*, 273 S.W.3d 152, 155 (Tex. 2008) (orig. proceeding) (noting that a justiciable interest "must be such that if the original action had never been commenced, and he had first brought it as the sole plaintiff, he would have been entitled to recover in his own name to the extent at least of a part of the relief sought"). Res judicata does not bar intervenors' request for attorney's fees in this case because, to the extent the Travis County district court passed judgment on intervenors' entitlement to such fees, that ruling was limited only to the work done that was reasonable and necessary to the prosecution of *that* case. *See Travelers Ins. Co. v. Joachim*, 315 S.W.3d 860, 862 (Tex. 2010) ("The party relying on the affirmative defense of res judicata must prove (1) a prior final determination on the merits by a court of

competent jurisdiction; (2) identity of parties or those in privity with them; and (3) a second action based on the same claims as were or could have been raised in the first action."). The issue of whether Hooks and Nolen incurred attorney's fees which were reasonable and necessary to prosecution of the Geter class action was not determined in the Travis County case, nor could it have been raised by the intervenors there. *See id.* Finally, though Hooks and Nolen do not dispute that the class has been adequately represented by class counsel appointed under Rule 42, the rule does not explicitly state that the trial court's authority to award fees in a class action is limited to those attributable to work performed by appointed class counsel. *See* TEX. R. CIV. P. 42(g), (h), (i). Instead, as noted, the recovery of attorney's fees is permitted by statute in declaratory judgment actions. See TEX. CIV. PRAC. & REM. CODE ANN. § 37.009. It is undisputed that, but for the intervention of Hooks and Nolen in the Travis County proceeding, the claims raised by the Geter class would have been released and the class members left with no relief. A trier of fact should be afforded the opportunity to determine whether the fees incurred by the intervenors in that regard were reasonable and necessary to the prosecution of the class action.

For the foregoing reasons, we conclude that the trial court erred in striking the plea in intervention of Hooks and Nolen to the extent they seek recovery of attorney's fees under the UDJA. We sustain their issue on appeal.[16]

---

[16] As to Blanks's intervention, the intervenors additionally argue that Farmers' motion to strike was improperly granted because the motion was not served on class counsel or on Blanks, in violation of Texas Rules of Civil Procedure 21 and 21a. We need not address this argument in light of our conclusion that the trial court improperly struck the intervention of Hooks and Nolen, which sought the same relief as Blanks's intervention—i.e., fees incurred for Blanks's legal work on their behalf. *See* TEX. R. APP. P. 47.1.

### III. CONCLUSION

Because specific performance was an inappropriate remedy in this case, we reverse the trial court's judgment compelling Farmers to offer or issue retroactive renewed HO-B policies to the Geter class members. We further reverse the trial court's order granting Farmers' motion to strike the intervention filed by Hooks and Nolen to the extent they seek recovery of attorney's fees under the UDJA.

We remand the cause to the trial court for further proceedings consistent with this opinion, including but not limited to determination of: (1) what remedy, if any, is appropriate and lawful under the circumstances to address Farmers' improper non-renewal of the HO-B policies at issue; and (2) whether Hooks and Nolen are entitled to recover attorney's fees under the UDJA, and if so, what amount of fees is reasonable and necessary. The remainder of the trial court's judgment is affirmed.


DORI CONTRERAS
Chief Justice

Delivered and filed the
10th day of October, 2019.